SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

Lyndell PARKS and P. Brenden
Gebben, Defendants.

No. 99–3072.

United States District Court,
C.D. Illinois,
Springfield Division.

Sept. 9, 2002.

Robert B. Kaplan, John P. Winsbro, Mark Kreitman, Bridget Moore, Securities & Exchange Commission, Washington, DC, for Plaintiff.

Phillip W. Offill, Krage & Janvey, LLP, Dallas, TX, Wm. F. Trapp, Brown Hay & Stephens, Springfield, IL, for Wayne F. Gorsek.

Daniel P. Schuering, John E. Kerley, Schuering & Kerley, Springfield, IL, for Lyndell Parks.

Hugh J. Graham, April Troemper, Graham & Graham, Springfield, IL, for P. Brenden Gebben.

## ORDER

SCOTT, District Judge.

This matter came before the Court on August 19, 2002, for the trial of the remedy phase of this proceeding. The Plaintiff Securities and Exchange Commission (SEC) appeared by its counsel Robert Kaplan, Mark Kreitman, and Bridget Moore. Defendant P. Brenden Gebben appeared personally and by his attorneys Hugh Graham III, and April Troemper. Defendant Lyndell Parks appeared personally and by his attorney John Kerley. The SEC asked the Court to enter a permanent injunction against Defendant Gebben and to enter a judgment against Defendants Gebben and Parks for disgorgement of profits, prejudgment interest, and civil penalties. Parks had previously agreed to the entry of a permanent injunction against himself. At the conclusion of the hearing, the Court took this matter under advisement. As set forth below, the Court has determined not to enjoin Defendant Gebben, but has determined to enter judgment against Defendants Gebben and Parks for disgorgement of profits, prejudgment interest, and civil penalties.

## BACKGROUND

In 1994, 1995, and 1996, Defendant Parks and Co-defendant Wayne Gorsek owned and operated two corporations named Strategic Investment Advisory, Inc. (SA), and Strategic Investments, Inc. (SI).[1] SA produced and distributed promotional materials that touted various stocks. The issuers of the promoted stock paid SA stock and cash to produce and distribute these materials. The Court determined in its Order dated April 20, 2001, that Gorsek and Parks had violated § 17(b) of the Securities Act of 1933, 15 U.S.C. § 77q(b); § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, by knowingly or recklessly making false and misleading statements in these promotional materials in connection with the offer or sale of the touted stock, and by failing to disclose within the promotional materials the type and amount of consideration paid to SA by the issuers.

1. Strategic Investment Advisory, Inc., was sometimes known as Strategic Advisory, Inc.

Defendant Gebben worked for SA from December 1994, to November 1996. He had various titles at SA, including Assistant Director of Research & Communications, and Lead Analyst, but he was not an owner or principal in SA. He wrote and distributed some of the promotional materials that touted stocks. On five occasions, between June 13 and June 19, 1996, he placed messages on an Internet website called the *Silicon Investor.* Gebben made false and misleading statements in these messages to promote the stock touted by SA.

On January 22, 2002, a jury trial began to determine Gebben's liability for his activities at SA. At the close of evidence on January 31, 2002, the Court partially granted SEC's motion for judgment as a matter of law finding that Gebben had violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, by knowingly or recklessly making the false and misleading statements in the five website postings. The jury then found that Gebben had violated § 17(b) in connection with the distribution of the SA promotional materials. The jury instructions stated that in order to find Gebben liable, the jury must find that the SEC proved, among other things, that Gebben distributed the promotional materials for payments received by him. *Jury Instructions* (d/e 207).

SI was a brokerage firm. Gorsek and Parks sold stock touted by SA to SI brokerage clients. Gebben did no work for SI. Gorsek and Parks used SA's false and misleading promotional materials to sell these stocks to brokerage customers. On April 15, 2002, the Court held a bench trial to determine whether Gorsek and Parks violated § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); and SEC Rule 10b–5, 17 C.F.R.

§ 240.10b–5, by using SA promotional materials in connection with the offer or sale of securities to SI brokerage customers. Immediately before the trial began, Parks agreed to entry of a consent judgment against him that found him liable for violating § 17(a), § 10(b), and Rule 10b–5, and to the entry of a permanent injunction against him enjoining him from violating the securities laws. After the two day bench trial, the Court determined that Gorsek had violated § 17(a), § 10(b), and Rule 10b–5 (d/e 234). Gorsek elected not to attend the liability bench trial personally, but to appear only by counsel.

Once the liability phase was completed, the Court set the remedy hearing. The SEC filed its pre-hearing memorandum on June 3, 2002, (d/e 238). Gorsek, Parks, and Gebben each filed a response (d/e 244, 245, 246, & 247). On August 13, 2002, six days before the remedy trial, Defendant Gorsek entered into a settlement with the SEC. Under the terms of the settlement, Gorsek agreed to pay $105,000.00 in disgorged profits, $70,000.00 in prejudgment interest, and $75,000.00 in civil penalties. He also agreed to a permanent injunction that enjoins him from violating the securities laws. Prior to this settlement, Gorsek litigated virtually every issue in this case.

At the beginning of the remedies hearing, the SEC and Parks stipulated that the judgment against Parks for disgorgement of profits would be $105,000.00. *Stipulation (d/e 250),* filed August 19, 2002. Parks only challenged the imposition of prejudgment interest and penalties on the basis that he had no ability to pay even the stipulated disgorgement sum. Gebben disputed the SEC's right to any remedy.

At the remedies hearing, the SEC relied on the Court's findings in the April 20, 2001, Order, the evidence presented at the January 2002, Gebben liability trial, and several additional exhibits. The SEC submitted copies of the SEC Form 10–KSB

for a corporation called Cryocon, Inc., dated July 13, 2001 (SEC Exhibit 1), and a Form SB 2 dated July 26, 2001, for Cryocon Inc. (SEC Exhibit 2). Both of these Exhibits stated that Defendant Parks was a director of Cryocon, Inc., but did not disclose any of this Court's finding in this proceeding against Parks.

The SEC also submitted a copy of a Form ADV for the company called Absolute Capital Management, LLC (ACM) dated July 17, 2002. *SEC Exhibit 3.* Exhibit 3 shows that Gebben is the Managing Director of ACM. The Form ADV discloses that Gebben is one of the Defendants in this action. The form includes the following explanation of this proceeding:

14. Provide a brief summary of circumstances related to action(s), allegation(s), disposition(s) and/or finding(s) disclosed above. (Your response must fit within this space provided.)

FOR ACTIONS OCCURRING DURING THE COURSE OF HIS EMPLOYMENT WITH STRATEGIC ADVISORY, GEBBEN WAS CHARGED BY THE S.E.C. CLAIMING VIOLATION OF 17(B) and 10(B) of the SECURITIES ACT OR SECURITIES EXCHANGE ACT AND RULE 10(B)5. IT WAS FOUND THAT GEBBEN VIOLATED SECTION 10(B) AND 10(B)5 OF THE REGULATIONS WHEN HE USED HIS GIVEN COMPANY TITLE OF ANALYST ON THE INTERNET WITHOUT DESCRIBING THAT HE WAS NOT AN INDEPENDENT SECURITIES ANALYST. FURTHER, IT WAS FOUND GEBBEN VIOLATED 17(B) WHEN HE USED EITHER NO DISCLOSURE OR INSUFFICIENT COMPANY DISCLOSURE ON WRITTEN AND ORAL COMMUNICATIONS REGARDING VARIOUS COMPANIES. THE S.E.C. SEEKS DISGORGEMENT OF SOME $10,500, ALONG WITH INJUNCTION AND PENALTIES AT THE NEXT PHASE OF THE PROCEEDINGS. GEBBEN, AN EMPLOYEE OF THE COMPANY AND NOT A DIRECTOR, OFFICER OR SHAREHOLDER, DENIED THE CLAIMS AND ANY INTENT TO HARM OR DECEIVE. THE ABOVE DESCRIPTION IS ALSO A MORE COMPLETE EXPLANATION FOR THE ANSWER GIVEN TO ITEM 11(H)1B ABOVE.

The SEC then submitted a summary of its calculation of Gebben's bonuses from SA and prejudgment interest on those bonuses. *SEC Exhibit 4.* The SEC used the interest rate charged on underpayment of income taxes. 26 U.S.C. § 6621(a)(2). SEC Exhibit 4 shows bonuses and prejudgment interest as follows:

*Gebben Bonus List*

| | | | |
|---|---|---|---|
| 12/31/95 | Madera Bonus | $ 850.00 | (value of 7500 shares of stock) |
| 02/22/96 | Stone Media Bonus | $ 3,187.50 | |
| 03/22/96 | Stone Media Bonus | $ 2,209.50 | |
| 05/21/96 | ALPS Bonus | $ 1,287.00 | |
| 06/27/96 | Haber Bonus | $ 2,674.50 | |
| | **TOTAL** | $10,208.50 | |

**Prejudgment Interest on Each Bonus From Date of Bonus to 05/31/02**

| | | |
|---|---|---|
| 12/31/95 | Madera Bonus | $ 575.66 |
| 02/22/96 | Stone Media Bonus | $2,080.30 |
| 03/22/96 | Stone Media Bonus | $1,414.85 |
| 05/21/96 | ALPS Bonus | $ 796.51 |

| 06/27/96 | Haber Bonus | $1,626.59 |
| | **TOTAL** | $6,493.91 |

**Disgorgement & Prejudgment Interest Total**

| 12/31/95 | Madera Bonus | $ 1,425.66 |
| 02/22/96 | Stone Media Bonus | $ 5,267.80 |
| 03/22/96 | Stone Media Bonus | $ 3,624.35 |
| 05/21/96 | ALPS Bonus | $ 2,083.51 |
| 06/27/96 | Haber Bonus | $ 4,301.09 |
| | **TOTAL** | $16,702.41 |

The summary of bonuses in SEC Exhibit 4 is based on Gebben's pay records from SA. *SEC Exhibit 5.* The records show that Gebben received compensation from December 15, 1994, through November 1, 1996. The records show that he received regular, semimonthly payments totaling $1,450.25 in 1994; $17,124.41 in 1995; and $13,096.74 in 1996. In addition, the report contains the following summary of additional payments from SA:

| Date | Paid From | | Amount |
|---|---|---|---|
| 02/22/96 | Marine Bank Memo Stone Media bonus | Consulting | $ 3,187.50 |
| 03/22/96 | Marine Bank Memo–Stone Media bonus | Consulting | $ 2,209.50 |
| 05/21/96 | J.W. Charles Clearing Memo–ALPS bonus | Misc. Expns | $ 1,287.00 |
| 05/21/96 | Marine Bank Memo–American Biomed | Travel Expense | $ 100.00 |
| 06/27/96 | J.W. Charles Clearing Memo–Haber bonus | Misc. Expns | $ 2,674.50 |
| | **TOTAL** | | $ 9,458.50 |

The SEC then submitted copies of two checks corresponding to the June 27, 1996, $2,674.50 payment, and the May 21, 1996, $1287.00 payment in the above table. *SEC Exhibit 6.* The June 27, 1996, check contains a memo notation that states, "Haber bonus." The May 21, 1996, check contains a memo notation that states, "ALPS shares sale." Finally, Gebben stipulated prior to his liability trial that he received 7,500 shares of Madera, Inc. stock. *Gebben Pre–Trial Order (d/e 178) at 6, ¶ 34.* At the time he received the stock, the 7500 shares had a market value of $ 850.00.

Gebben then presented his evidence. First, he presented testimony of two character witnesses, Barbara Budinger and William Forsyth. Budinger is a friend of Gebben's family; Gebben attended school with Budinger's son. Budinger testified that she had a very high regard for Gebben. She testified that Gebben was honest and enterprising. She did not have any business dealings with Gebben. Forsyth is Gebben's uncle. He also testified to the truthfulness and veracity of Gebben. He once sold Gebben an insurance policy, but otherwise has had no business dealings with Gebben.

Gebben then testified. Gebben testified that the record of payments, SEC Exhibit 5, came from SA's accountant, and he did not know if the records were accurate. Gebben did not know whether the description accompanying any payment was accurate. He did not know whether any particular payment was actually a bonus, expense reimbursement, travel expense,

or consulting payment. Gebben testified that all sums were deposited into his account.

After Gebben left SA, he secured an MBA degree from the University of Illinois at Springfield. He then engaged in a course of study from the Wharton School of Business and secured an additional designation as a Certified Investment Management Analyst (CIMA). In February 1998, he began working for a company called ITS located in Pittsburgh, Pennsylvania. He did not engage in any direct marketing. Rather, he performed macroeconomic analyses in order to advise brokerdealers or other financial advisers concerning how best to allocate an individual's investments within a family of mutual funds. Gebben was terminated at ITS in February 2002, after this Court's finding of liability. ITS, however, continued paying Gebben for several additional months.

Gebben now plans to compete with ITS through his new company ACM. He and a fellow employee at ITS, Brian Osborn, formed ACM in January 2001. ACM will provide the same type of macroeconomic analyses and portfolio management advice as ITS. Gebben is in the process of applying to have ACM become a registered investment adviser under the Investment Advisers Act of 1940, 15 U.S.C. § 80a–1–80a–52. ACM filled out SEC Exhibit 3, the ADV Form, as part of this process. If successful, ACM will be authorized to manage more than $25,000,000.00 in investor assets. Gebben testified that ACM would not take possession of investor assets, but would be authorized to move investor assets among mutual funds that are within the same family of funds. Gebben submitted his Exhibit 8, which is the ACM compliance manual. Each ACM employee is required to read the entire manual. The manual details the compliance requirements for registered investment advisers. Gebben spent hours working with an SEC compliance consultant to develop this manual.

Gebben also submitted his Exhibits 8, 9, and 10. Gebben Exhibit 8 is an SEC summary report which estimates the total profit from the SI and SA fraud. The total estimated profit, with prejudgment interest, was $1,605,565.99. Gebben Exhibit 9 is a copy of the check made payable to Gebben in the amount of $500.00. The memo on the check says, "20% of Stone Media bonus." Gebben Exhibit 10 is an internal SA memo dated August 16, 1995, containing the minutes of a meeting of SA employees. The memo states that Gorsek discussed changing the SA bonus program with the employees.

> It is a cash bonus that is only paid out if a given company hits, and maintains for 5 market days, a given stock level. Wayne and Lyndell have proposed changing this bonus so that all Advisory employees, including both of them, are operating under the same agreement. The proposal presented centered around giving each of the employees company shares when they are registered and issued, which should happen within 60 days of the contract being signed. The shares would be given to the employees at the beginning of the relationship with the company and would be retroactive for current clients. For the Stone Media situation, which we hit the bonus on July 17th making the cash due on August 17th, Wayne and Lyndell would instead give each person who was due the $2,000 Stone Media bonus 5,000 shares worth of stock, which would have market value yesterday of $3,700. However, it is not known when the actual, tradable stock would be received by each employee.

Gebben finally expressed remorse for the harm he caused to investors as a result of his work at SA. He stated that he "felt

horrible." *Transcript of remedies hearing (d/e 254),* Vol. 1 at 124. On cross-examination, Gebben conceded that he acted with the intent to deceive and apologized to the victims. *Id.* at 128–29, 140. Gebben further admitted that he never attempted to contact any investor or to compensate any investor. He further stated that he did not tell his former employer ITS that he intended to start a competing business. He denied soliciting either ITS clients or employees while he was still working at ITS.

Gebben then submitted the testimony of Martin Dean. Dean worked briefly for SI as a broker. He testified that Gebben did not make decisions at SA. He believed Gebben and he were hired to lend credibility to the operations. Each was a college graduate. Dean, however, did not work directly with Gebben. Dean marketed securities with SI; Gebben distributed promotional materials through SA.

Parks then testified. Parks is currently out of the securities or financial public relations business. He works for two companies, Paragon Management Marketing Inc. (Paragon) and Eagle Publications (Eagle). Paragon markets industrial products, and Eagle publishes annual directories. Paragon is a two-person operation run by Parks and his wife. Parks then submitted financial statements dated July 15, 1999, and November 16, 2001. *Parks Exhibits 1 & 2.* The July 15, 1999, financial statement showed assets of $3,800.00, and liabilities of $55,100.00. The November 16, 2001, statement is a joint statement of Parks and his wife Audra Gardner–Parks. The statement showed assets of $12,350.00, and liabilities of $162,990.00.

Parks testified that his financial condition is substantially the same as it was on November 16, 2001. Parks further testified that he pays approximately $12,000.00 in annual child support. As of November 1, 2001, Parks owed the Internal Revenue Service unpaid income taxes and interest for 1995 in the sum of $19,519.39; for 1996 in the sum of $28,918.33; for 1997 in the sum of $5,401.21; and for 1998 in the sum of $4,563.34. He stated that he still owes substantially all of these taxes and accrued interest to the IRS. Parks's 2000 tax return shows that his adjusted gross income for that year was $37,018.00. As of the date of the hearing, Parks had not yet filed his 2001 tax return. Parks testified that he currently had two bank accounts with total balances of less than $250.00.

Parks said that he formerly was a director of Cryocon, Inc. He said that the SEC Exhibits 1 and 2 are Cryocon filings with the SEC. He testified that Cryocon's attorneys decided not to disclose the status of this case in those filings because there then was no final judgment yet entered against Parks. SEC Exhibits 1 and 2 also indicate that Parks owned 2,000,000 shares of Cryocon stock, constituting 9.2 percent of the company's shares. Parks testified that he, in fact, had only an option to purchase those shares. Once the SEC questioned the Cryocon filings, he resigned as a director and gave up his stock options. Parks did not list these stock options as an asset on his financial statement.

On cross-examination, Parks admitted that Paragon had provided investor relations services. Parks stated that he stopped providing investor relations services with Paragon within the previous year. Parks further admitted that Cryocon agreed to pay Paragon $3,000.00 per month for investor relations services. Parks remains the general manager of Paragon.

Parks further admitted that although his July 12, 1999, financial statement listed his cash at $800.00, his bank account showed a balance of $4,000.00 on that date. He explained that the $4,000.00 was commit-

ted to pay the costs of a remodeling job he contracted to perform for a third party. He did not list the funds because he did not believe that the money was his. He further admitted that his financial statement did not list four open accounts at various brokerage houses. Parks stated he did not list the accounts on his financial statement because, although they were still open, the accounts were inactive at the time.

Parks further admitted that he overestimated his income on financial statements submitted to a bank in connection with business mortgage loan applications. He estimated his 1994 salary at $70,000.00, his 1995 salary at $50,000.00 and his 1996 salary at $80,000.00. In reality, he made $30,000.00 in 1994, $40,424.00 in 1995, and $54,603.00 in 1996. Parks explained that each estimate given to the bank was a projection made before the end of each calendar year.

Based on all of the evidence, the SEC argued that Gebben should be enjoined permanently from violating the security laws, ordered to disgorge $10,208.50 in bonuses received plus prejudgment interest, and pay a penalty of $200,000.00. The SEC argued that Parks should be ordered to pay more than $87,000.00 in prejudgment interest and a $200,000.00 penalty; this is in addition to the agreed injunction and the stipulated $105,000.00 in disgorgement of profits. Gebben argued that he should not be enjoined and should not have to pay anything. Parks argued that he should not be subject to interest and penalties because he has no ability to pay. The Court addresses each of these issues in order.

*Permanent Injunction*

■ The SEC asks the Court to permanently enjoin Gebben from violating the securities laws. Such injunctions are appropriate if there is a reasonable likelihood of future violations. *SEC v. Holschuh,* 694

F.2d 130, 144 (7th Cir.1982). The Court should look to the totality of the circumstances to determine whether future violations are likely to occur. The factors to consider include (a) the extent of the defendant's participation in the fraud; (b) the degree of scienter; (c) the gravity of the harm caused by the offense, (d) the isolated or recurrent nature of the infraction, (e) the likelihood that defendant's customary business activities might again involve him in such transactions, (f) the defendant's recognition of his own culpability, and (g) the sincerity of his assurances against future violations. *Id.*

Considering all of the factors in this case, the Court concludes that Gebben is not likely to violate the securities laws in the future. Gebben went to work for SA shortly after college with no experience in the securities industry. He was merely an employee of SA making approximately $20,000.00 a year; he was not an owner, officer or director of SA. He had no connection to SI at all. His § 10(b) and Rule 10b–5 violations were isolated, consisting of five Internet postings made during one week in June 1996. Gebben further expressed remorse for his actions in this hearing. After leaving SA, he secured an MBA and specialized training in investment management and worked for four years with a registered investment adviser without committing any securities law violations. His subsequent four-year work history is significant evidence that Gebben's assurances against future violations are sincere. Further, the fact that he worked for a registered investment adviser for four years without committing any violations indicates that he is not likely to violate the securities laws if he remains in that field as he plans.

The SEC cites the fact that ITS failed to disclose this pending action against Gebben in its filings with the SEC. Gebben,

**1132**

however, had no control over ITS filings with the SEC; he was not an owner, officer, or director. He informed ITS of the status of this action as it progressed, and ITS decided whether to disclose the matter on its filings. He cannot be held responsible for ITS's failure to file complete disclosures.

The SEC also argues that Gebben's disclosure of this proceeding in the ACM Form ADV is deceptive and, thus, indicates a likelihood of future securities violations. The Court is troubled by the disclosure in paragraph 14 quoted above. The statement is convoluted, does not clearly identify the statutory sections at issue, and continues to deny liability. Even so, the Court is convinced that future violations are not likely to occur. Gebben expressed remorse for his actions, and he has agreed to revise paragraph 14 once this Order is entered. The Court concludes that his four year track record at ITS still supports the conclusion that he will follow the securities laws in the future. The Court denies the request for a permanent injunction against Gebben.

*Disgorgement of Profits*

■ The Court grants the Commission's request for judgment against Gebben for disgorgement of profits in the sum of $10,208.50. Disgorgement is an appropriate equitable remedy designed to deprive violators of their ill-gotten gains. *See SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1474 (2nd Cir.1996). The SEC is only obligated to approximate the amount of the profit from the illegal activity. *SEC v. Patel,* 61 F.3d 137, 139 (2nd Cir.1995). In this case, Gebben received more than $40,000.00 in compensation and other payments from SA for his work there. The SEC could reasonably ask Gebben to disgorge all compensation received from SA. The $10,208.50 is unquestionably a fair approximation of the ill-

gotten gain Gebben received from his participation in SA's illegal activity.

Gebben argues that these payments were not directly connected to any violation of securities laws. The Court disagrees. The jury in Gebben's liability trial was instructed that Gebben could only be found liable if the SEC proved that he distributed the deceptive promotional materials that violated § 17(b) for payments received by him. The jury so found when it found him liable. The Court agrees. The evidence at Gebben's liability trial established that his primary duties at SA were to help prepare and distribute promotional materials in violation of § 17(b). All of his compensation was connected to this illegal activity, including his bonuses. The Court, therefore, orders Gebben to pay disgorgement of profits in the sum of $10, 208.50, as requested by the SEC.

Parks and the SEC stipulated that he would be responsible for disgorgement of profits in the sum of $105, 000.00, the same amount as co-defendant Gorsek.

*Prejudgment Interest*

■ The awarding of prejudgment interest is within the sound discretion of the Court. The Court must balance the equities between the parties under the circumstances of the particular case. *Michaels v. Michaels,* 767 F.2d 1185, 1204 (7th Cir. 1985). The equities of this case require both Parks and Gebben to pay some prejudgment interest. The Court, therefore, grants the SEC's request for prejudgment interest against Gebben from January 1, 1996, to the date of judgment at the rate charged for underpayment of income taxes, 26 U.S.C. § 6621(a)(2). Gebben has not challenged the appropriateness of the rate. As of May 31, 2002, the prejudgment interested totaled $6,493.91.

■ In Parks's case, however, the Court finds that the equities require that Parks

be ordered to pay only $35,000.00 in prejudgment interest rather than the full amount requested. The main consideration for this determination is a need for proportionality between the judgments entered against Gorsek and Parks. All the evidence shows that Gorsek was the primary person in control of both SA and SI. He, therefore, should be required to pay a proportionately higher sum than Parks. The SEC agreed that Gorsek should pay $70,000.00, in prejudgment interest; the Court determines that the appropriate equitable prejudgment interest award against Parks should be $35,000.00.

The SEC agrees that proportionality is an appropriate equitable factor, but argues that Gorsek's settlement cannot be compared to a litigated judgment against Parks. The SEC argues that the settlement allows the SEC to avoid litigation costs and that Gorsek agreed to pay the entire judgment within 10 days.

The Court disagrees with the SEC in the case of Parks. Often, a settlement cannot be used as a basis for evaluating the proportional treatment of wrongdoers. The person who settles generally saves the SEC the cost of proving its case; the person who settles often more readily accepts responsibility for the wrongful conduct; and the person who settles may assist the SEC in establishing its case against the other liable parties. In this case, however, Gorsek settled only after vigorously litigating every previous stage of this matter. Rather than saving the SEC litigation costs, Gorsek forced the SEC to prove liability at a two day bench trial which Gorsek did not even attend. In contrast, Parks admitted his liability without a trial and further agreed to a permanent injunction and to the amount of profits to be disgorged. He thus saved the SEC the cost of proving both liability and the right to two of its primary remedies. He only put the SEC to the task of addressing the issue of his ability to pay interest and a penalty. Thus, in this case, Parks both admitted his liability before Gorsek and saved the SEC significantly more litigation expenses than Gorsek.

The Court, therefore, finds that the circumstances of this case require that the remedy imposed on Parks should be proportional to the remedy imposed on Gorsek. Parks has already agreed to pay the same disgorgement of profits and to be subject to a substantially similar permanent injunction. Given Gorsek's position as the person in charge of SA and SI, the Court believes that the equities of this case require that the other remedies imposed on Parks should be less than those imposed on Gorsek. The Court, therefore, determines that Parks should pay prejudgment interest of $35,000.00, which is one-half of the prejudgment interest imposed on Gorsek.

The Court allowed the full amount of prejudgment interest claim against Gebben, because, unlike Parks, Gebben litigated both his own liability and whether he should be ordered to disgorge profits. He, therefore, put the SEC to the task of proving every element of its case against him. The remedy imposed against Gebben, therefore, cannot be compared to the SEC settlement with Gorsek.

*Civil Penalty*

■ Civil penalties are appropriate in this case because both Parks and Gebben committed securities fraud. Parks knew that the SA promotional materials were false and deceptive. Gebben knew that his Internet postings were false and deceptive. Penalties are, therefore, an appropriate way to deter future violations. In this case, where the violations involved fraud and resulted in a significant risk of substantial losses to other persons, the maximum possible penalty per violation is the greater of the actual gain from the illegal

conduct or $100,000.00. 15 U.S.C. § 77(d). Gebben argues that the maximum penalty should be $5,000.00, because the § 17(b) violation does not require proof of scienter and because his actions did not result in a significant risk of loss. 15 U.S.C. § 77(d). The Court disagrees; Gebben acted with scienter when he placed the false and misleading postings on the *Silicon Investor*. Those postings created a significant risk of loss to any potential investor fooled by Gebben's misrepresentations. The SA promotional materials also created a significant risk of loss to any investor fooled into believing that SA performed any independent analysis. The appropriate maximum possible penalty is $100,000.00 per violation for both Gebben and Parks.

The Court is to determine the appropriate penalty to impose against each Defendant. *SEC v. Lipson*, 278 F.3d 656, 662 (7th Cir.2002). In this case, the Court determines that Parks should pay a penalty of $10,000.00. The Court considers, to some extent, Parks's inability to pay a judgment. *See SEC v. Custable*, 1996 WL 745372 at *4 (N.D.Ill.1996). The Court also finds, for the reasons stated above, that the overall remedy imposed against Parks should be proportionally less than the overall remedy imposed on the more culpable wrongdoer Gorsek.

The evidence presented by Parks shows some current lack of ability to pay a significant penalty. He seems to have no significant assets and little available after payment of living expenses and child support. Parks, however, has made incomplete and inconsistent statements about his financial condition. He did not disclose his stock options with Cryocon, Inc. as an asset. He inflated his projected income repeatedly to banks in connection with business mortgage loans. He did not disclose the $3,000.00 per month contract between Cryocon, Inc., and Paragon. His representations about his financial condition are not totally credible. The Court is, therefore, convinced that he has some ability to pay a penalty.

The Court sets the amount of Parks's penalty at $10,000.00, to deter future violations and to maintain some proportionality between the overall remedy imposed on Parks and the overall remedy imposed on the more culpable Gorsek. This is particularly true since the penalty sought by the SEC is for the operations at SA, not SI. The evidence supports the finding that Parks was less involved at SA than was Gorsek. In this case, the SEC agreed to an overall monetary remedy against Gorsek of $250,000.00. In light of the equities of the case, the Court finds that a penalty of $10,000.00 is appropriate. The $10,000.00 penalty will also result in an overall monetary remedy against Parks of $150,000.00. This overall remedy is proportional to the $250,000.00 monetary remedy imposed against Gorsek.

The Court determines that Gebben should pay a penalty of $10,000.00. This is a significant penalty for his violations; it roughly equals the amount of the judgment against him for disgorgement of profits. The Court finds that this penalty will provide the appropriate deterrent against future violations.

The SEC argues for a penalty of $200,000.00 each, against both Parks and Gebben. With respect to Parks, the Court finds the SEC's position to be inconsistent with its decision to accept a $75,000.00 penalty against Gorsek. With respect to Gebben, the Court finds the SEC's position to be disproportionate to the violation committed; a penalty roughly equal to the disgorgement amount is an equitable penalty under the circumstances.

THEREFORE, the Court enters judgment in favor of the Securities and Exchange Commission and against Defen-

dants Lyndell Parks and P. Brenden Gebben as follows:

A. Defendant Brenden Gebben is ordered to pay $10,208.50 in disgorgement of profits, plus prejudgment interest thereon accruing from January 1, 1996, until the date of this judgment, at the rate set for underpayment of income taxes, 26 U.S.C. § 6621(a)(2);

B. Defendant P. Brenden Gebben is ordered to pay a civil penalty of $10,000.00;

C. Defendant Lyndell Parks is ordered to pay $105,000.00, in disgorgement of profits, plus prejudgment interest in the sum of $35,000.00; and

D. Defendant Lyndell Parks is ordered to pay a civil penalty of $10,000.00.

The SEC's request for a permanent injunction against Defendant P. Brenden Gebben is DENIED. All pending motions are denied as moot. This case is closed.

IT IS THEREFORE SO ORDERED.